_____

LYDIA G. TRUESDELL,

                             Plaintiff                DECISION AND ORDER

-vs-

                                                 1:18-CV-0198 CJS

ANDREW M. SAUL,
Commissioner of Social Security,

                             Defendant.

_____

## APPEARANCES

For the Plaintiff:                Brandi C. Smith, Esq.
                                 Kenneth R. Hiller, Esq.
                                 Law Offices of Kenneth Hiller
                                 6000 N. Bailey Avenue, Suite 1A
                                 Amherst, New York 14226

For the Defendant:            Heather Sertial, Esq.
                                 Prashant Tamaskar, Esq.
                                 Social Security Administration
                                 Office of General Counsel
                                 26 Federal Plaza, Room 3904
                                 New York, New York 10278

                                 Dennis J. Canning, Esq.
                                 Scott C. Keller, Esq.
                                 Social Security Administration
                                 Office of General Counsel
                                 601 E. 12th Street, Room 965
                                 Kansas City, Missouri 64106

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final
determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),
which denied the application of Lydia Truesdell for Supplemental Security Income
("SSI") benefits.   Plaintiff claims to be completely disabled due to a combination of
ailments, including seizures, fibromyalgia, orthopedic problems and mental health
problems.   Now before the Court is Plaintiff's motion (Docket No. [#12]) for judgment on
the pleadings and Defendant's cross-motion [#17] for the same relief.   For the reasons
discussed below, Plaintiff's application is denied, Defendant's application is granted,
and this action is dismissed.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this
action.   The Court will summarize the record as necessary for purposes of this Decision
and Order.

Plaintiff's education consists of high school and some years of college.
Plaintiff's employment history includes jobs as a waitress, janitor and retail store clerk.[1]
Although, Plaintiff only had reported earnings during the five-year period between
2009 and 2013.[2]  In 2012, Plaintiff earned almost fourteen thousand dollars, but during
the other four years she never earned above $7,500.   Plaintiff is primarily a single,
stay-at-home parent, who subsists on social services benefits.   At the start of the

---

[1] Transcript at 289.
[2] Transcript at 404.

period of alleged disability, Plaintiff was caring for two young children.   Later during the period at issue in this case, Plaintiff gave birth to another child.

In 2013, Plaintiff received her medical care from the Community Health Center of Niagara, in Niagara Falls, New York, where her primary care physician was Tinh Dao, M.D. ("Dao").[3]  Plaintiff also received mental health therapy at Niagara County Mental Health, where her therapist was Mary Webb, LCSWR ("Webb").[4]   Plaintiff also saw a neurologist, Naypathappa Anand, M.D. ("Anand").[5]

On July 26, 2013, Plaintiff began treatment with Webb at Niagara County Mental Health.[6]   Plaintiff told Webb that she was unemployed and lived by herself with her two young sons, ages 7 and 1 month.   Plaintiff's chief complaint was ongoing problems with the father of her 7-year-old child, whom Plaintiff claimed was abusive.   Plaintiff stated that she was experiencing "acute anxiety" over this relationship.[7]   Plaintiff indicated that she had no relationship with the father of her 1-month-old child, and implied that she did not know the father's identity, since she had been "assaulted and became pregnant."[8] Plaintiff told Webb that her former significant other (the father of the 7-year-old) had physically and sexually abused her over a period of years, during which she had several orders of protection against him.   Plaintiff also stated, though, that this same man had regular unsupervised visitation with their son.   Plaintiff complained of symptoms including crying spells, flashbacks, and feelings of detachment from others.   Plaintiff

---

[3] Transcript at 414, 426.
[4] Transcript at 426,
[5] Transcript at 429.
[6] Transcript at 484.
[7] Transcript at 474.
[8] Transcript at 474, 498.

also claimed that she had been hospitalized on four occasions for depression years earlier.[9]   Upon examination, Webb reported that Plaintiff seemed oriented, alert and euthymic, with normal memory.[10]   Webb noted that Plaintiff seemed preoccupied with domestic violence, and that she exhibited poor judgment and diminished attention/concentration.   Webb further noted that Plaintiff's euthymic mood seemed odd, since it "did not match the symptoms she was alleging," and that she would need to further explore and evaluate this inconsistency.[11]   Indeed, Webb went so far as to contact Plaintiff's prior therapist about her concerns regarding the apparent "disconnect between [the] client's affect and reported symptoms," and the prior therapist reportedly told Webb that she had had the same concern about Plaintiff.[12]

On August 1, 2013, Plaintiff again met with Webb for therapy, at which time Webb noted that Plaintiff was "currently in a court battle with son's father and has petitioned for an Order of Protection and is clearly in opposition to what the court is ordering and recommending."[13]

On August 7, 2013, Plaintiff saw Webb again, at which time Webb noted that Plaintiff seemed to exhibit an "evasive" attitude.[14]   Webb again noted that Plaintiff's affect seemed incongruous with the symptoms that she was alleging. Plaintiff told Webb that her memory was impaired.   Webb noted, though, that Plaintiff's attention and

---

[9] Transcript at 474-475.
[10] Transcript at 475.
[11] Transcript at 474.
[12] Transcript at 485.   The prior therapist further told Webb that Plaintiff had complained to her of post-traumatic stress disorder ("PTSD") due to childhood sexual abuse. *Id.*
[13] Transcript at 485.
[14] Transcript at 488.

concentration seemed normal, and that she could "attend and maintain focus."[15] Plaintiff told Webb that she had a few close friends and was actively involved in her church.   Plaintiff stated that in her free time she went for walks, worked on the computer, and engaged in "painting, pottery, bowling, baking [and] cooking."[16]   Webb again noted that Plaintiff seemed evasive, and that her statements did not seem to match her outward appearance, stating: "Since her affect does not match her symptoms nor the severity of symptoms as she identified them and her story was not making sense as she related, therapist will further assess her on an ongoing basis for clarification of this."[17]

On August 21, 2013, Plaintiff went to physician Dao's office for the first time, to establish a treating relationship.   During that visit, Plaintiff had a physical examination.[18]   At that time, Plaintiff's only reported complaints were of a runny nose and congestion.   Plaintiff appeared to be in no distress, and the physical exam was unremarkable, except for some mild congestion and tenderness in the sinuses. Plaintiff had full range of motion in her neck, and an examination of her back was similarly normal.[19]  Neurologic findings were also normal, and Plaintiff had full strength in all extremities.[20]   The results of a mental status exam were similarly normal, with Plaintiff exhibiting good eye contact, good judgment and insight, good mood, and full

---

[15]  Transcript at 488.
[16]  Transcript at 500.
[17]  Transcript at 500.
[18]  Transcript at 468.
[19]  Transcript at 468.
[20]  Transcsript at 469.

affect.[21]   In sum, Plaintiff's examination was completely normal, except for some sinus congestion.

On August 28, 2013, Plaintiff had another therapy session with Webb, who again noted that Plaintiff's affect seemed "inappropriate, smiling," in contrast with the symptoms that she was alleging.[22]   Webb reported that Plaintiff seemed preoccupied with the fact that her ex-boyfriend (the father of the 7-year-old son) had moved his residence nearer to her's and the child's, and that Plaintiff' attitude seemed "dramatic."[23] Webb reported that during the session, she pointed out that Plaintiff had made statements that seemed to contradict what she had previously told Webb, but Plaintiff denied that she had done so.[24]

On October 9, 2013, Plaintiff had another therapy session with Webb, at which time her mood was again "euthymic."[25]

On November 5, 2013, Plaintiff returned to Dr. Dao's office, now complaining of being "IN LOTS OF PAIN." (Transcript at 466, emphasis in original).   Plaintiff complained of "generalized pain," and stated that she had a family history of fibromyalgia, and believed that she might also have fibromyalgia.   In this regard, Plaintiff claimed that she had painful and swollen joints, "coordination difficulty," dizziness, fainting, gait abnormality, headaches, loss of strength, tremors and loss of bladder and bowel control.[26] Despite all of these complaints, upon physical examination

---

[21] Transcript at 469.
[22] Transcript at 501.
[23] Transcript at 501.
[24] Transcript at 502.
[25] Transcript at 509.
[26] Transcript at 467.

the findings were again normal, and Plaintiff appeared to be in no acute distress.[27]    A

mental status exam was similarly normal.    Nevertheless, the examiner diagnosed

Plaintiff with fibromyalgia, prescribed Lyrica, and referred Plaintiff for a neurological

exam (even though the examiner's own neurologic exam was normal).[28]

     On September 11, 2013, Plaintiff returned to see Webb.    Plaintiff discussed her

tumultuous relationship with her former boyfriend, "Michael," who she said might be the

father of her youngest child.    Plaintiff stated that she was interested in reuniting with

Michael, but that he would need to change his behavior.    Plaintiff also related ongoing

problems with the father of her older son.    In that regard, Webb noted that Plaintiff

seemed "vague and avoidant" when asked about her alleged flashbacks involving

abuse by this man.    Plaintiff indicated that her anxiety about this relationship was

causing her to only get 2-3 hours of sleep per night, but Webb noted that Plaintiff

appeared to be fully rested.    On this point, Webb reported that Plaintiff had not

previously complained of difficulty sleeping, which was a further point of "incongruence"

that she would need to address with Plaintiff at some later time.[29]

     On October 23, 2013, Plaintiff returned for another session with Webb, at which

time Webb reported additional concerns over apparent inconsistencies in Plaintiff's

statements.    In particular, after Plaintiff again claimed that she was only getting 2-3

hours of sleep, Webb again noted that Plaintiff always seemed alert and rested during

---

[27] Transcript at 467.
[28] Transcript at 466.
[29] Transcript at 511.

their sessions.[30]   Plaintiff also indicated that resumed smoking after her boyfriend Michael cheated on her with another woman.   Webb pointed out, however, that Plaintiff had previously indicated that she was not in a relationship with Michael.   Webb reiterated that there were "discrepancies that need to be cleared up."[31]

On November 1, 2013, Plaintiff filed an application for SSI benefits, claiming that she became totally disabled on January 15, 2013. (This alleged disability onset date was seven months prior to the completely normal examination by Dao on August 21, 2013).   Plaintiff alleged disability due to bipolar disorder, post-traumatic stress disorder ("PTSD"), anxiety, obsessive-compulsive disorder ("OCD"), spina bifida, fibromyalgia, asthma, osteoarthritis, sciatica, cataracts and hashimoto thyroiditis.[32]

On February 3, 2014, Plaintiff returned to Dao's office, for follow up of her various complaints.   Plaintiff appeared to be in no distress and her physical/neurological examination was normal, with full strength in all extremities.[33]   Plaintiff denied having any sleep disturbance, coordination difficulty, dizziness, fainting, gait abnormality, headache or loss of strength.[34]

On March 27, 2014, Plaintiff returned for another therapy session with Webb, at which time she was smiling and euthymic.   Webb reported that Plaintiff's speech was "contradictory," and further stated: "This client continues to give contradictory statements . . . to statements made in earlier sessions and is not able to clarify this.

---

[30] Transcript at 513.
[31] Transcript at 513.
[32] Transcript at 317.
[33] Transcript at 531-532.
[34] Transcript at 532.

She has little insight into her problems."[35]  Webb continued: "For example she said that [her older son] James's father is no longer giving her trouble and has not done so since he was arrested last year in February.   Therapist attempted to clarify this with her and confronted how this does not line up with what she said when she first came in.   Writer looked back at admission note and read to her that her statements at the time in opening in August 2013 were that James's father still come around and has physically and sexually abused her.   She attempted to change the subject therapist brought her back to focus on this issue which she denied."[36]

On April 10, 2014, Plaintiff returned to Webb's office.   Plaintiff was initially euthymic, but became angry when Webb pointed out that Plaintiff had seemingly made various inconsistent statements to her, and that Plaintiff needed to be truthful if she hoped to benefit from treatment.[37]  Plaintiff stated that she had been truthful, and that she felt that Webb was not listening to her concerns.   In particular, Plaintiff stated that she wanted the therapy sessions to focus more on her ongoing problems with her boyfriend Michael, and less on Plaintiff's past problems.[38]

On April 14, 2014, neurologist Dr. Anand examined Plaintiff upon a referral from Dr. Dao.   Anand noted that Plaintiff was complaining of low back pain, radiating into her lower extremities, primarily into the right leg.[39]   Plaintiff reportedly stated that her fibromyalgia symptoms consisted of pain around her shoulder blades, and that Lyrica

---

[35] Transcript at 558
[36] Transcript at 558.
[37] Transcript at 255.
[38] Transcript at 555.
[39] Transcript at 573.

helped her symptoms.   Plaintiff also reported having several migraine headaches per week, but stated that Excedrin Migraine was effective in treating them.   Anand performed a physical exam and noted only slightly decreased foot flexion/dorsiflexion on one side, and "tenderness at L4-L5 lumbar spine."

On April 28, 2014, neurosurgeon Veetai Li, M.D. ("Li") examined Plaintiff upon a referral from Dr. Dao, concerning Plaintiff's back pain.[40]  According to Li, Plaintiff described her condition as follows:

> She was well until January of this year when out of the blue her back pain recurred which is with her 24/7.   The intensity is 8-9/10 located in the mid lower lumbar area, radiates up her back and into her buttocks bilaterally but not any farther than that.   She denies any lower extremity paresthesias or weakness. Her bladder is a little bit different in that she has a harder time emptying her bladder[.][41]

Plaintiff denied having any "numbness, tingling or weakness in her extremities."[42] However, Plaintiff told Li that she needed a cane to ambulate, due to pain.   Upon physical examination, Li noted that Plaintiff had "full range of motion of all of her extremities with strength 5/5 and good tone noted throughout."   Further, Plaintiff's gait was normal, and "she was able to demonstrate a tandem gait without any difficulty." Nevertheless, Li ordered an MRI of the lumbar spine.

On May 15, 2014, Plaintiff returned to Dao's office, now complaining of panic attacks and anxiety.   Plaintiff indicated that she was already receiving mental health

---

[40]  Transcript at 739-740.
[41]  Transcript at 740.
[42]  Transcript at 739.

therapy, but that Webb was "not interested" in treating her panic attacks.[43]   Plaintiff also apparently complained of pain and decreased movement in her lumbar-sacral area.[44] Upon examination, Plaintiff appeared both physically and mentally normal, with no abnormal findings.   She had normal gait and normal motor strength and full strength in all extremities.   Plaintiff also denied any difficulty sleeping.[45]   Nevertheless, based on her subjective complaints Plaintiff was assessed with "depressive disorder, not elsewhere classified," and "panic disorder without agoraphobia," prescribed medication for her depression, and referred for a CT scan of her lumbo-sacral spine.

On June 3, 2014, Dr. Anand notified Dr. Dao's office that he had again seen Plaintiff.   Anand reported that Plaintiff was again complaining of back pain radiating into her right leg.[46] (She had previously told Dr. Li that the pain did not radiate into her legs). Plaintiff also told Anand that she had been in a car accident, and had sustained a "whiplash injury, [but had not gone] to the ER."   Plaintiff indicated that she was experiencing neck pain, radiating into her left shoulder.   Plaintiff stated that she took Excedrin for migraine headaches, and Lyrica for "fibromyalgia," and that both medications were effective.   Anand performed a physical exam and reported normal findings, including full strength in all extremities, except that Plaintiff's "foot flexion and dorsiflexion on the right side [was] mildly weaker than the left side."

On June 10, 2014, Plaintiff returned to see Webb, at which time Plaintiff seemed

---

[43] Transcript at 529.
[44] Transcript at 529.
[45] Transcript at 530.
[46] Transcript at 572.

anxious and depressed, with a constricted affect. Webb opined that to the extent Plaintiff had depression and anxiety, it was related to her relationship with her boyfriend, Michael.[47]

On June 17, 2014, Plaintiff returned to Dr. Dao's office, complaining only of a sore throat and ear ache.[48]

On July 15, 2014, Webb discharged Plaintiff due to Plaintiff's non-compliance with treatment.[49] In particular, Webb noted that over the course of their treating relationship, Plaintiff had kept fourteen appointments and cancelled seven appointments, without re-scheduling the missed appointments. Webb also reiterated there had been apparent inconsistencies in Plaintiff's statements to her.

On August 5, 2014, neurologist Dr. Anand again examined Plaintiff.[50] Anand noted that Plaintiff now was complaining of "back pain with radiation down her low extremities, left more than right." (On June 3, 2014, Plaintiff told Anand that the pain was radiating down her right leg). Anand noted that Plaintiff had already received various tests, including an x-ray of her spine, MRI of her brain, and various tests for connective-tissue problems, and that all the test results had been normal. Anand noted that his own physical exam of Plaintiff was also normal, and that her "coordination/gait [was] normal." Anand nevertheless indicated that he was sending Plaintiff for a CT scan of her lumbosacral spine.

---

[47] Transcript at 541.
[48] Transcript at 528.
[49] Transcript at 535.
[50] Transcript at 570.

On August 26, 2014, Dr. Anand wrote to Dao's office with the results of a CT scan of Plaintiff's lumbar spine.[51]   Anand indicated that the CT scan showed only "mild disc bulging at L3-L4, L4-L5."   Anand noted that Plaintiff had complained to him of "severe pain in the back and . . . difficulty with ambulation."   Anand further noted that Plaintiff was using a cane to ambulate, purportedly due to pain.   However, Anand stated that upon examination, Plaintiff's cranial nerves were unremarkable and her strength was symmetrical.[52] Anand further indicated that he had conducted various tests for connective disorders, the results of which were unremarkable.

Shortly thereafter, Plaintiff switched to an entirely new team of doctors, including a new primary care doctor, neurologist and mental health treatment provider.   Plaintiff reportedly indicated that she had been dissatisfied with the care that she was receiving from her old doctors, although the particular reasons for that are not specified.[53]

On September 9, 2014, Plaintiff began a new mental health treatment relationship at Horizon Corporation ("Horizon"),[54] where her primary therapist was Elizabeth Ostrom, N.P. ("Ostrom").   According to the intake note, Plaintiff self-referred herself for treatment of depression and anxiety.   Plaintiff reportedly stated, however, that her immediate interest was to get her "case worker off [her] back about work": "I need help with my mind.   My thoughts are all over the place.   I need help to get my case worker off my back about work – I will flip out.   I can't work.   I can't be around

---

[51] Transcript at 569.
[52] Transcript at 569.
[53] Transcript at 658.
[54] Transcript at 690.

people, I can't handle it."[55]   The Court concludes that means that at that time, Plaintiff's social services caseworker was encouraging her to find employment.

Plaintiff reportedly told Ostrom that she had previously been diagnosed with "PTSD, OCD, social anxiety, panic, bipolar and depression."   Plaintiff stated that she had been depressed "on and off" since age eleven, but that her depression had been particularly bad since 2013, when she had a child and then found out that her boyfriend was cheating on her.[56]  Plaintiff stated that her depression was 10/10, that she felt hopeless and helpless, and that she could not concentrate or focus.[57]

Regarding her alleged OCD (obsessive compulsive disorder), Plaintiff told Ostrom that she constantly checks the locks on her doors at home, and constantly runs the vacuum cleaner.   Indeed, Plaintiff asserted that she cleaned her home with the vacuum cleaner for hours at a time: "She reports constantly vacuuming – states that she spends "a lot of hours" vacuuming – "as much as I can physically try to."[58]

Plaintiff further told Ostrom that she had been diagnosed with attention deficit disorder ("ADD") as a teenager,[59] although as far as the Court is aware this is the first and only mention of such a diagnosis in the record.

Regarding her family history, Plaintiff reportedly told Ostrom that her father had attempted suicide and that her second cousin's father had actually committed suicide.[60] However, when Plaintiff previously provided her family history to Webb, she stated only

---

[55] Transcript at 690.
[56] Transcript at 690.
[57] Transcript at 690.
[58] Transcript at 691.
[59] Transcript at 691.
[60] Transcript at 691.

that her cousin had committed suicide, but made no mention of her father having mental illness or attempting suicide.[61]

Plaintiff told Ostrom that she feels paranoid and believes that people are out to get her. Plaintiff alleged that she had attempted suicide four times as a teenager, though she previously told Webb that she had attempted suicide one time.[62]  Plaintiff also claimed that she had been hospitalized seven times for mental health issues. However, she previously told Webb that she had been hospitalized only four times for depression.[63]  Oddly, Plaintiff indicated that on one occasion she had admitted herself to the hospital for a "nervous breakdown" after witnessing a friend have a seizure, although she indicated that she herself had no history of seizures.[64]  Plaintiff also reported having "paralyzing" panic attacks "every day and night" for over a year, with each attack lasting "hours to days."[65]  Plaintiff stated that she could not go out in public without having a panic attack, although she could occasionally go grocery shopping.[66]

When Ostrom formulated her Plan of Care for Plaintiff, she noted that she questioned Plaintiff's credibility at times due to the inconsistency of some of her statements.[67]  In doing so, Ostrom became the third mental health therapist to question

---

[61] Transcript at 497.
[62] Transcript at 483 ("one suicide attempt as a teenager").
[63] Transcript 474-475.
[64] Transcript at 691 ("I fell apart after I found my best friend convulsing on her sofa."); *see also*, Transcript at 691 ("Denies history of seizures, diabetes.").
[65] Transcript at 690.
[66] Transcript at 691.
[67] *See*, Transcript at 693 ("I do question her credibility at times due to mixed reports – for instance, records indicate a history of reported hallucinations, and Lydia denies ever having any A.V hallucinations.").

Plaintiff's credibility.[68]

On October 15, 2014, Plaintiff had her first office visit with her new primary care doctor, Lonny Walter, M.D. ("Walter").[69]   Plaintiff reportedly told Walter that she had been in a motor vehicle accident in 2004, and that she had experienced chronic pain ever since, particularly in her back.   Plaintiff also stated that she had been diagnosed with fibromyalgia and headaches.   Upon physical examination, Dr. Walter noted that Plaintiff appeared to be "healthy [and] in no apparent distress."   Regarding Plaintiff's musculoskeletal system, Walter noted: "Good overall tone and ROM [range of motion] extremities.   Normal gait.   [She d]oes complain of some pain with trunk and neck ROM."

On November 6, 2014, Plaintiff saw Dr. Walter for a possible upper respiratory infection, at which time Walter noted that Plaintiff appeared to be healthy and in no apparent distress, apart from sounding congested.[70]

On November 10, 2014, Plaintiff met with her new neurologist, Michael Giglio, M.D. ("Giglio").[71]   Plaintiff reportedly stated that she had been experiencing pain "everywhere" since she was a teenager, but that the pain had been getting worse "over the last few months."   Plaintiff further stated that she was having "new symptoms," namely "shakiness, weakness in upper and lower extremities."   Plaintiff claimed that she was having memory loss and "uncontrollable shakes" or seizures at night.   Plaintiff

---

[68] Transcript at 485.
[69] Transcript at 746.
[70] Transcript at 745.
[71] Transcript at 593.

stated that her migraine headaches were better and that she wanted to focus on her seizures.   Upon physical examination, Plaintiff claimed to have pain in her jaw, upper neck muscles and upper back muscles.   Giglio also observed a "slightly antalgic gait." Otherwise, though, Plaintiff's results were normal, including full strength bilaterally in her extremities.[72]   Giglio also noted "little to no pain on palpitation of the cervical vertebrae."

On November 18, 2014, Plaintiff told Ostrom that she was "[g]etting 5-6 hours of interrupted sleep most nights."[73]

On December 4, 2014, Plaintiff returned to see Giglio.   Plaintiff denied having any shaking "spells" since her last visit.   She complained, however, about "general pain" and "stinging and burning sensations in her neck."[74]   The results of Giglio's physical examination were normal, including a normal gait.[75]  Giglio noted, somewhat vaguely, that Plaintiff "continues to have copious general pain,"[76] though the results of his examination were, again, unremarkable.

On December 29, 2014, Plaintiff returned to Giglio's office, stating again that she had no new shaking episodes.   Plaintiff also stated that her migraine headaches had improved, and that she was happy with the treatment she was receiving for those.

On February 17, 2015, Plaintiff reportedly told Ostrom that she belonged to a Bible study group, which provided her with a good support network.[77]

---

[72] Transcript at 595.
[73] Transcript at 670.
[74] Transcript at 590.
[75] Transcript at 591.
[76] Transcript at 589.
[77] Transcript at 654, 655.

On February 19, 2015, Giglio provided Plaintiff with a report concerning her ability to work.   At that time, Plaintiff was pregnant, and Giglio noted that the pregnancy was considered "high risk."   Notably, Giglio's report did not purport to measure or report on any of Plaintiff's functional limitations.   Instead, Giglio crossed out the section of the form intended for measurements of Plaintiff's functional abilities and wrote, "Not measured."   Below that section of the form, there are two fill-in-the-blank narrative sections, one entitled "Limitations on Work Activities," and one entitled "Screening for Possible SSI Referral."   It clearly appears to this Court that the handwriting in these two sections is different, though this is not explained.[78]   The section entitled "Limitations on Work Activities" appears to be in the same handwriting with which Giglio purportedly signed the form, and suggests that Plaintiff is temporarily unable to work, due to her pregnancy, stating: "The pt is currently in high levels of general pain + during pregnancy I cannot treat her pain well without harming the baby."[79]   Meanwhile, the writing under "Limitations on Work Activities" appears to be in a different hand, and suggests that Plaintiff is permanently unable to work, stating: "Pt has severe impairment + function not able + not allowed to work under any circumstances or conditions."   As an aside, the

---

[78] Transcript at 737.
[79] Transcript at 737.

handwriting on the second narrative appears to match Plaintiff's handwriting.[80][81][82]

However, since the Commissioner has not noted this or expressed any similar concern

on this issue, the Court, for purposes of this Decision and Order, will assume that the

entire document represents Giglio's opinion.[83]

On February 21, 2015, Plaintiff went to a hospital emergency room, claiming that

she had suffered a seizure.[84]   Plaintiff indicated that she was not taking her usual

medication because she was pregnant.[85]   Neurological testing and an MRI scan of

Plaintiff's brain were negative for any problems.[86]   Plaintiff was given Keppra, an anti-

seizure medication, and sent home.   Plaintiff later unilaterally stopped taking the

Keppra, purportedly because she felt that it was making her angry.

On June 8, 2015, Plaintiff, who was still pregnant, saw Giglio again, complaining

of increased pain in her hips and lower back.[87]   Plaintiff stated that she had stiffness

and inflammation, and difficulty "walking, standing, going up and down stairs, walking to

---

[80]  Compare, the aforementioned section of Giglio's report, Transcript 737, with Plaintiff's handwritten request for Appeals Council Review, Transcript 391.

[81]  It is a crime to obtain or to attempt to obtain SSI benefits by fraud. *See*, 42 U.S.C. § 1383a(a)(3) ("Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such [SSI] benefit, or (B) the initial or continued right to any such benefit of any other individual in whose behalf he has applied for or is receiving such benefit, conceals or fails to disclose such event with an intent fraudulently to secure such benefit either in a greater amount or quantity than is due or when no such benefit is authorized . . . shall be fined under Title 18, imprisoned not more than 5 years, or both[.]")

[82]  This report was submitted to the ALJ directly by Plaintiff's attorney, who presumably obtained it from Plaintiff. Transcript at 315-316.

[83]  The Court's belief on this point has no bearing on the outcome of this action in any event, since, as discussed further below, the Court agrees with the ALJ's determination that even if Giglio wrote the report, the report is merely an opinion on an issue reserved to the Commissioner, which is not supported by actual testing or by Giglio's own treatment notes.

[84]  Transcript at 238.

[85]  Transcript at 239.

[86]  Transcript at 239.

[87]  Transcript at 582.

the corner store."[88] Plaintiff stated that she had been in "horrible" pain lately, since she had run out of Lyrica, her fibromyalgia medication.[89] Giglio's physical examination of Plaintiff, though, revealed normal results, with full strength in all extremities and normal gait.[90]

On September 22, 2015, Plaintiff told Ostrom that she was having difficulty with her youngest son, in that she was having to chase him because he kept climbing out of his stroller: "States that he makes his way out of the stroller and is running off on her while they are out and about. Reports significant amount of stress related to this. States that her knee pain has increased due to having to run after [him]."[91] Plaintiff also stated that she was taking her various medications, and experienced no side effects: "Reports medication compliance, denies having side effects. . . . Sleep is fair – reports getting 4-6 hours of sleep most nights."[92]

On October 19, 2015, Giglio saw Plaintiff again for an office visit, at which time Plaintiff, who had recently given birth, was complaining of having a "terrible" headache.[93] Plaintiff stated that she was not sleeping well, "secondary to her new baby." Plaintiff again complained of "copious general pain." Plaintiff had not had any new seizures. Regarding the alleged seizures, Giglio referred to them as "unspecified convulsions," and noted that he was "not yet convinced that these are epileptic seizures vs non-epileptic ones." Plaintiff complained of pain in her neck and back upon

---

[88] Transcript at 582.
[89] Transcript at 582.
[90] Transcript at 583.
[91] Transcript at 620.
[92] Transcript at 620.
[93] Transcript at 579.

palpation.   Otherwise, though, the results of Giglio's physical examination were again normal, including normal gait.[94]

Also, on October 19, 2015, Plaintiff was seen by Gaurav Jain, M.D. ("Jain"), a specialist in "physiatry," meaning physical medicine and rehabilitation.[95]   Plaintiff stated that she had pain at the level of 7-9/10, and that her symptoms were exacerbated by walking, lifting and standing.   According to Jain: "She describes her discomfort as sharp tingling, burning, stabbing sensation throughout her shoulders, low back, legs and feet; global in nature."   Jain noted that Plaintiff put forth "poor effort" during his physical examination of her, and concluded that she had essentially full strength ("motor examination with reinforcement appears 5/5 and again, with poor effort; rated 4+/5 globally"), with negative straight-leg raising tests bilaterally.[96]

On January 22, 2016, Plaintiff went to the hospital complaining of slurred speech and left-sided weakness.[97]  Hospital staff initially suspected that Plaintiff might be having a stroke or cerebral vascular accident ("CVA"), and they performed various testing including a cervical spine MRI[98] and a CT scan of Plaintiff's head and brain.   The CT scan showed only a "dystrophic calcification 5 mm focus left central cerebellum," which Plaintiff apparently maintains is from an old head injury sustained during a motor vehicle accident.   The MRI of Plaintiff's neck showed three abnormalities: a disc protrusion at CS-C4, indenting the thecal sac and touching the anterior aspect of the spinal cord; a

_____

[94]  Transcript at 580.
[95]  Transcript at 576.
[96]  Transcript at 577.
[97]  See, Transcript Ex. 9F, pp. 695-719.
[98]  Transcript at 698.

mild diffuse disc protrusion at C5-C6; and a mild annular tear at C6-C7 without disc protrusion." There is no statement in the medical record, however, relating these findings to Plaintiff's complaint of left-sided weakness and slurred speech, and Plaintiff was evidently released from the hospital without restrictions.[99] The actual date of discharge is unclear, since some of the documents indicate that Plaintiff was discharged on January 22nd,[100] while others suggest that she remained in the hospital until January 25th.

On February 26, 2016, after Plaintiff's claim for SSI benefits was denied initially, a hearing was held before an Administrative Law Judge ("ALJ"). At the hearing, Plaintiff testified that she lived with and provided care for her three children, ages nine, two and seven months.[101] Plaintiff also testified, however, that she was essentially a complete invalid, who was barely able to walk and who was unable to perform any household chores such as cooking, cleaning or shopping. Plaintiff indicated that she received help doing all of those chores from family members or persons in the community.[102] Plaintiff attributed her alleged physical limitations to orthopedic problems in her neck and a traumatic brain injury.[103]

---

[99] Transcript at 697.
[100] Transcript at 202, 707, 714.
[101] Transcript at 300.
[102] Transcript at 306. For example, concerning Plaintiff's claimed inability to lift, which would preclude her from lifting her own baby, she testified that first thing in the morning, one of her older daughters would need to come over to her house and physically hand the baby to her, and that someone would need to hand the baby to her every time it needed to be fed. *See, e.g.*, Transcript at 305 ("I wake up and my daughter comes over and helps me[.] . . . She'll pick up and bring over the baby to me so I can feed him. When I'm done feeding him, she'll hold him while I crawl up the stairs to go to the bathroom"; *see also, id.* at 311 ("I have to make sure I'm sitting on the sofa when I hold the baby.").
[103] Transcript at 308.

Plaintiff further testified that a month prior to the hearing, she had been hospitalized for a potential stroke, after she lost feeling in the left side of her body and had slurred speech.[104] Plaintiff stated that her doctors concluded that she did not have a stroke, and that her symptoms were caused by cervical disk issues and a brain injury. In this regard, Plaintiff stated: "I have five vertebrae in my cervical [sic] that are herniated and the top two that are herniated and pushing on my spinal cord. And I have brain damage on the left side of my brain caused by traumatic brain injury."[105]

Plaintiff indicated that she needed a motorized scooter or cane to ambulate, that she was unable to stand long enough to take a shower, and that she was unable to sit for very long.[106] Regarding her alleged need to use a cane, Plaintiff testified that her cane was "given" to her by her "original neurologist," Dr. Eugene Gosy, and that Dr. Giglio told her to "keep using it," though there is no record of either event in the transcript. Plaintiff stated that she did not take walks outside because she was afraid that she would fall.[107]

Regarding Plaintiff's purported inability to stand or walk, at the hearing she stated:

> I can only walk a couple steps at a time then I have to stop and take a rest. The left side of my body becomes tingly, numb and weak because of the herniated discs. And on the right side of my body, I'll lose feeling and sensation and movement because of the brain damage in the left side of my brain.[108]

---

[104] Transcript at 303.
[105] Transcript at 304. In this regard, Plaintiff seems to assume that an injury to the left side of her brain would cause weakness on the left side of her body, though the Court questions the accuracy of that assumption.
[106] Transcript at 308-309.
[107] Transcript at 307-308.
[108] Transcript at 308.

However, earlier in the hearing Plaintiff indicated that her doctors had told her that her episode in January 2016, involving weakness on her *left* side, had been caused in part by the same left-side brain damage.[109]

Plaintiff further testified that her doctors had told her not to lift more than five pounds.[110]   When the ALJ asked Plaintiff which doctor had told her not to lift more than five pounds, she indicated that "all" of her doctors had told her that, including Giglio, Jain, Walter and Anand,[111] although there is no mention of such a limitation in any of those doctors' notes.

Additionally, Plaintiff testified that spina bifida affected her bladder and bowel function.[112]   Plaintiff indicated that she had a seizure disorder, but that she had not experienced a seizure during the past year.   Plaintiff also stated that she had intense anxiety and was afraid to leave her home.[113]

Plaintiff further testified that she experienced side effects from her various medications, including a feeling of "exhaustion," trouble concentrating and thinking, and frequent need to urinate.[114]

Regarding her work history, Plaintiff asserted that she had last worked as a retail associate in January 2013, but that she stopped working because "[i]t became too painful [to the point] where [she] was starting to become dependent on narcotic pain

---

[109]  Transcript at 304.   Though, again, there is no evidence that her doctors made such a correlation, or, indeed, that they ever identified a cause for Plaintiff's stroke-like symptoms.
[110]  Transcript at 311.
[111]  Transcript at 311.
[112]  Transcript at 312.
[113]  Transcript at 308.
[114]  Transcript at 304-305.

medications."[115]

At the close of the hearing, the ALJ left the record open for Plaintiff's attorney to submit additional medical records.   The ALJ also ordered orthopedic and psychological consultative examinations,[116] both of which took place on March 31, 2016.[117]

The psychiatric consultative evaluation was performed by Susan Santarpia, Ph.D. ("Santarpia"). In relating her background and employment history, Plaintiff reportedly told Santarpia that she had stopped working in January 2013, at the direction of her doctors: "Doctors told me to stop working and not work anymore because of my disabilities and excruciating pain."[118]   However, there is no record of any doctor instructing Plaintiff to stop working, or even expressing an opinion that she should stop working due to pain.[119] Santarpia reported that when she asked Plaintiff to describe her mental health symptoms, Plaintiff's responses were "extremely vague," and that when Santarpia asked Plaintiff whether she had particular symptoms, Plaintiff claimed to have every symptom that Santarpia mentioned.[120] Santarpia noted that despite claiming to have anxiety, depression and manic symptomatology, Plaintiff insisted that she was able to care for her three young children.[121]   Santarpia conducted a mental status examination, and reported essentially normal findings, including coherent and goal-

---

[115]  Transcript at 301.
[116]  Transcript at 315.
[117]  Transcript at 749-757, 760-770.
[118]  Transcript at 749.
[119]  The earliest reference in the medical records to Plaintiff's employment status is on July 26, 2013, when Plaintiff reportedly told Webb that she was "unemployed," as opposed to disabled. Transcript at 473; *see also, id.* at 498.
[120]  Transcript at 750-751.
[121]  Transcript at 751.

directed thoughts, full and appropriate affect, euthymic mood, intact attention and concentration, intact recent and remote memory, average cognitive functioning, and fair insight and fair judgment.[122] Regarding potential problems that Plaintiff might have with employment, Santarpia stated in pertinent part: "Mild impairment i[n] demonstrating and performing complex tasks independently. Difficulties are caused by lack of motivation."[123] In the section of Santarpia's report entitled "appearance," she reported that Plaintiff's "posture and motor behavior [were] normal," and made no mention of Plaintiff using a cane.[124]

The orthopedic consultative examination was conducted by Rita Figueroa, M.D. ("Figueroa"). When Figueroa asked Plaintiff to describe her chief complaints, Plaintiff began by telling Figueroa that her cervicalgia gave her constant pain in both arms and fingers, with the left arm being worse than the right. Plaintiff indicated that she had migraines that "never go away," and that she has fibromyalgia which "hurts from head to toe."[125] Plaintiff further stated that she had suffered from seizures since 2004, consisting of both "grand mal" and "petit mal" seizures.[126] Plaintiff further offered that she "had a few petit mal seizures a few weeks ago," though there is no mention of that elsewhere in the record. Indeed, during the hearing before the ALJ on February 26, 2016, Plaintiff stated that she had not had a seizure during the past year.[127] When

---

[122] Transcript at 751-752.
[123] Transcript at 753, 755.
[124] Transcript at 751.
[125] Transcript at 760.
[126] Transcript at 760. The Court observes that Giglio never used the terms "grand mal" or "petite mal" in his notes and, indeed, he indicated that he was not even sure about the nature of Plaintiff's seizures. In any event, Plaintiff never previously claimed to have anything resembling a petit mal seizure.
[127] Transcript at 309.

asked about her activities of daily living, Plaintiff told Figueroa, "I'm in constant excruciating pain," and further stated that she was unable to walk or stand without falling frequently with caused her additional injuries, and that she had to walk slowly and carefully using a cane. Figueroa attempted to perform a typical orthopedic examination, but Plaintiff essentially declined to perform most of the requested movements, purportedly due to pain. Figueroa's "prognosis" was "poor," and her medical source statement was as follows:

> The claimant will have limitations with activities requiring moderate exertion. The claimant should avoid exposure to smoke, dust, and any respiratory irritants. The claimant should avoid driving, operating motorized machinery, and being up on ladders due to her history of seizures. The claimant will have moderate limitations to prolonged walking and standing due to the gait instability. Overall, this was a difficult exam because the claimant could not fully engage.

Transcript at 765. Regarding Figueroa's reference to "gait instability," she had, earlier in her report, mentioned that Plaintiff was using a cane, and stated that the cane was "medically necessary," based on Plaintiff's statements and her gait during the examination.[128] Nevertheless, Figueroa stated that Plaintiff could lift and carry up to 10 pounds occasionally; sit for one hour at a time and for six hours during an 8-hour workday; stand for thirty minutes at a time and for one hour during a workday; and walk for 30 minutes at a time and for one hour during a workday. Figueroa stated that Plaintiff could continually use her right hand, but was unable to use her left hand at all.

On August 3, 2016, after having received the consultative examiners' reports and some additional evidence from Plaintiff's attorney, the ALJ conducted a supplemental

---

[128] Transcript at 763.

hearing, at which he took testimony from a vocational expert.[129]

On August 17, 2016, the ALJ issued his decision, denying Plaintiff's application. In pertinent part, applying the familiar five-step analysis for evaluating disability claims, the ALJ found that Plaintiff has not engaged in substantial gainful activity since November 1, 2013; that she has severe impairments consisting of degenerative changes in the cervical spine, fibromyalgia, migraine headaches, anxiety, bipolar disorder, depression and PTSD, as well as non-severe impairments consisting of asthma and a seizure disorder; and that none of her impairments, singly or in combination, meet or equal a listed impairment.   Prior to reaching the fourth step of the sequential evaluation, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except that, she was "limited to performing simple, routine, and low stress [work], which is defined as having occasional decisionmaking, occasional changes in the work setting, and occasional interaction with others."   Based on this RFC finding, the ALJ determined, at the fourth step of the sequential evaluation, that Plaintiff could not perform her only past relevant job, in retail, due to the lifting requirements of that job.   However, at the fifth and final step, the ALJ found, based upon the VE's testimony in response to hypothetical questions involving the subject RFC determination, that Plaintiff could perform at least six particular jobs in the national economy, which the ALJ listed.[130]

In making the RFC determination, the ALJ reviewed the medical evidence and

---

[129] Transcript at 286-295.
[130] Transcript at 28-29.

28

found that Plaintiff's claims concerning the severity of her symptoms were "not fully consistent with the evidence." The ALJ noted, for example, that while Plaintiff testified that four of her doctors had told her not lift more than five pounds, there was no record of such a statement by any doctor in the record. The ALJ also noted that while Plaintiff claimed to need a cane to ambulate, medical examinations by her doctors typically showed that she had a normal gait and full strength in her extremities. Regarding the opinion evidence, the ALJ found that Dr. Figueroa's findings and opinion were entitled to little weight, since Plaintiff's presentation at the consultative examination was "so divergent from the clinical findings of [her] [treating] doctors." Indeed, the ALJ stated: "Claimant's presentation at the consultative orthopedic examination on March 31, 2016 appears completely unrepresentative of her physical functioning for much of the alleged period of disability when compared with the other objective medical evidence."[131] Similarly, the ALJ gave little weight to Dr. Giglio's opinion that Plaintiff was "not allowed to work under any circumstances or conditions" since it was inconsistent with the other medical or record and not supported by Giglio's own findings. On the other hand, the ALJ gave "significant weight" to Dr. Santarpia's consultative opinion, finding that it was supported by her examination findings and consistent with the other evidence of record.

After receiving the ALJ's unfavorable ruling, Plaintiff requested review by the Appeals Council. Specifically, on October 13, 2016, Plaintiff, who had previously had an attorney but who was apparently proceeding *pro se* at that time, filed a request for

---

[131] Transcript at 27.

review by the Appeals Council, using a pre-printed form.[132]   Thereafter, on both

December 30, 2016 and January 10, 2017, Plaintiff, who by then had obtained new

counsel, submitted additional evidence to the Appeals Council.[133]   The additional

evidence consisted of approximately 250 pages of medical records, from the period

2014-2016.   The additional evidence consists of the following: Mental health office

notes from Horizon, covering the period February 17, 2015 through November 15, 2016;

office notes from Dr. Jain for the period October 31, 2014 through October 19, 2015;

records from family practitioner Jeffrey Burnett, D.O. ("Burnett") for the period January

13, 2015 through October 24, 2016; records from Dr. Walter for the period October 2,

2014 through March 1, 2016; records from Dr. Giglio for the period October 15, 2014

through December 10, 2015; records from St. Mary's Hospital relating to Plaintiff's

hospitalization following a seizure in February 2015; records from Niagara Falls

Memorial Medical Center for the period January 10, 2016 through October 11, 2016;

records from nephrologist Richard Steinacher, D.O. ("Steinacher") for the period

September 24, 2014 through October 9, 2014; records from rheumatologist Stanley

Michalski, M.D. ("Michalski"), dated March 29, 2016; and records from neurosurgeon

Tobias Mattei, M.D. ("Mattei"), dated March 29, 2016.

The bulk of the additional evidence submitted to the Appeals Council is additional

evidence from Horizon, consisting of notes from Plaintiff's talk-therapy sessions with

Ostrom.   Some of the information in the records is duplicative of exhibits that were

---

[132] Transcript at 395.
[133] Transcript at 41, 152.

before the ALJ.   Otherwise, the records are generally unremarkable, consisting primarily of notes concerning attempts to vary Plaintiff's medications due to the fact that she was continuing to breastfeed her child; Plaintiff's complaints regarding side-effects of various medications, particularly a medication, Reglan, that she was taking to increase her breast milk production; and Plaintiff's discussion of stressors in her life, primarily the stress of having to care for three young children, including an active and defiant two-year-old boy.   However, one office note in particular, which is dated March 15, 2016, jumps out.[134]   To put this date in context, it was approximately two months after Plaintiff allegedly suffered her stroke-like symptoms, several weeks after the first ALJ hearing, and two weeks before Plaintiff's consultative examination with Dr. Figueroa.   The reader will recall that at the hearing, Plaintiff had told the ALJ that she was barely able to walk or stand and was completely unable to perform any household chores.   However, during the office visit with Ostrom on March 15th, Plaintiff reportedly stated that she was experiencing insomnia, and that she was "keeping herself busy" by "doing chores around the house all night."[135]   (Plaintiff had also previously told Ostrom, on September 9, 2014, that she constantly vacuum cleaned her house for hours at a time due to her alleged OCD condition.)   During the same office visit on March 15, 2016, Plaintiff told Ostrom that she felt overweight, and was "hoping to start some kind of exercise, but is limited with her sciatica."   Significantly, Ostrom's notes contain no reference to Plaintiff's hospitalization in January 2016, no reference to Plaintiff being

---

[134]  Transcript at 66.
[135]  Transcript at 66.

almost completely unable to use the left side of her body, and no reference to Plaintiff

using a cane. Also contained within the additional evidence is a note of an office visit

on February 17, 2015, at which Plaintiff reportedly told Ostrom, "I can't work because if I

go and be around people I'm going to snap."[136]

The additional records from Dr. Jain are two office notes, together totaling seven

pages. The first such note, dated October 19, 2015 is a duplicate of a report that was

before the ALJ. In the second note, dated October 31, 2014, Plaintiff reportedly told

Jain that she was having pain from her neck radiating into her leg arm and hand,

decreased strength, and lower back pain radiating into her left leg. Plaintiff also told

Jain that she was "fighting for the disability because of psychiatric and physical

problems."[137] Upon physical examination, Jain noted tenderness over Plaintiff's spine

and decreased strength bilaterally, though he noted that Plaintiff "did not put in much

effort" during the exam. Jain did not refer to Plaintiff using or needing a cane to

ambulate. Instead, Jain noted that Plaintiff "walks with a normal gait."

The additional records from Dr. Burnett consist of 25 pages of office notes and

test results. The office notes are from October 2016, and refer to Plaintiff wanting to

switch her primary care from Dr. Walter to a new primary care physician. At her initial

visit with Burnett, Plaintiff reported having a variety of psychological problems on a daily

basis, including thoughts that she would be better off dead.[138] Plaintiff also stated that,

"her left side of her body goes weak and limp a few times/month and each episode lasts

---

[136] Transcript at 85.
[137] Transcript at 152.
[138] Transcript at 160.

a day to a few days."[139] Plaintiff claimed that her other doctors had not been able to find a cause for this problem.   She suggested, though, that it was due to brain damage: "[S]he has seen neurogy and neurosurgery [and] neither has been able to figure out why this is happening but they did find a necrotic area in her brain." However, attached to Burnett's office note are results from a cranial CT scan and cranial MRI taken at the time Plaintiff was complaining of stroke-like symptoms, which mention that calcifications on the left side of Plaintiff's brain, but conclude that there is "no acute intracranial abnormality."[140]   Plaintiff also told Burnett that she had migraine headaches "4-5 days/week."   The office note does not mention Plaintiff using or needing a cane to ambulate.   On October 24, 2016, Plaintiff returned to Burnet's office with the same complaints.   Plaintiff stated that she had an episode of left-sided "numbness" a week earlier.   The examiner noted that Plaintiff appeared to be well and in no acute distress, and a musculoskeletal exam showed "no swelling deformity."[141]   The office note does not mention Plaintiff using a cane.

The additional evidence from Dr. Walter consists of random office notes from 2014 through 2016, some of which are duplicative of records that were before the ALJ.[142]   Of particular interest is an office note dated March 1, 2016, shortly after Plaintiff claimed to suffer stroke-like symptoms.[143] Plaintiff was complaining of a "flare in neck pain," and complained that she was not getting proper pain management

---

[139] Transript at 160.
[140] Transcript at 180.
[141] Transcript at 158.
[142] See, Transcript at 196-197.
[143] Transcript at 191-193.

treatment from her other doctors.    When Walter indicated that he could only offer

Plaintiff conservative measures for her pain, she responded that she might as well have

gone to a different doctor.[144]    Oddly, the office note does not mention the stroke-like

incident and hospitalization in January 2016.    Walter noted, however, that Plaintiff

claimed to having pain and weakness down one side of her body, but that her

movements did not seem consistent with her complaint: "Appears unhappy, holding

neck and head stiffly, has LT side coat on and RT side off.    Moves strongly dependent

on cane in RT hand.    [Complaining of] pain and weakness down entire side of body but

body movement not consistent with that."[145]    Walter opined that Plaintiff's bipolar

disorder was "strongly influencing her response to this current neck issue."[146]

The additional records from Dr. Giglio consist of office notes from 2014 and

2015, and most if not all of the information contained therein is duplicative of evidence

that was before the ALJ.    On October 15, 2014, Giglio noted that Plaintiff's migraine

headaches responded "remarkably" well to over-the-counter Excedrin, though he

warned Plaintiff that she could experience worse headaches from over using

analgesics.[147]

The additional records from St. Mary's Hospital relate to Plaintiff's ER visit in

February 2015 following a seizure, and are basically duplicative of evidence already in

the record.    That is, the hospital accepted Plaintiff's claim that she had a seizure and

---

[144] Transcript at 191.
[145] Transcript at 193.
[146] Transcript at 193.
[147] Transcript at 235.

placed her on medication, though neurological and MRI testing was negative.[148]

The additional evidence from Niagara Falls Memorial Medical Center consists of a summary of laboratory test results from 2016.

The additional evidence from Dr. Steinacher relates to kidney stones and urological problems which do not appear to relate to Plaintiff's disability claim.[149]

Finally, the additional records from Doctors Michalski and Mattei consist of office notes, both from visits that took place on March 29, 2016.[150]   Neither Michalski nor Mattei refers to Plaintiff using or needing a cane to ambulate. Michalski's report does not mention Plaintiff's recent hospitalization or her alleged stroke-like symptoms involving complete inability to use her left side.   Michalski reported that Plaintiff was complaining of pain in her neck and shoulder blades, and of more generalized pain that she had been experiencing for twenty years.   Plaintiff claimed that she was unable to stand on the scale to be weighed.   Upon examination, Michalski noted that movement of Plaintiff's neck appeared to be "poor and painful," and he recommended Tramadol, heat and massage.   In Mattei's notes from that same day, he reported that Plaintiff was complaining of "diffuse pain in her cervical, thoracic and lumbar spine."   Mattei noted that Plaintiff had undergone testing in January 2016, and that such testing showed degenerative changes in the cervical spine "without any significant central canal or foraminal stenosis," as well as "multilevel degenerative disc disease."   Mattei also noted that while there was a bulging disc in Plaintiff's cervical spine, it was a "very small

---

[148] Transcript at 239.
[149] Transcript at 261-275.
[150] Transcript at 277-283.

posterior disc protrusion," without stenosis.    Mattei further observed that the MRI of Plaintiff's brain in January 2016 showed "no acute findings."    Mattei opined that Plaintiff's pain was "essentially myofascial in nature," meaning muscular.[151] Mattei further stated: "The patient seems to be in mild discomfort, but no acute distress.    She has poor body care.    She has diffuse pain on palpation of her cervical , thoracic and lumbar spine.    Sensation is normal in the upper and lower limbs.    Strength is normal in the upper and lower limbs.    Reflexes are physiologic and symmetric in the upper and lower limbs. No major pain on palpation of the SI joints."[152]    Mattei recommended "conservative treatment," and stated that it that failed, they could consider trying "cervical epidural spinal stimulation."

On December 8, 2017, the Appeals Council issued a notice indicating that it had denied Plaintiff's request for review.    Along with this notice, the Appeals Council provided both an "AC Exhibit List," describing Plaintiff's 1-page request for review as Exhibit 11B, and an Order making Exhibit 11B part of the record.    Apart from this reference to Exhibit 11B, the Appeals Council's notice and order are essentially boilerplate, devoid of any reference to the 250 pages of additional medical records that Plaintiff submitted to the Appeals Council.

On February 5, 2018, Plaintiff commenced this action, and on November 28, 2018, she filed the subject motion [#12] for judgment on the pleadings.    Plaintiff contends that the Commissioner's decision should be reversed for the following

---

[151]  Transcript at 281.
[152]  Transcript at 282.

reasons: 1)   the ALJ gave inadequate reasons for the weight that he assigned to the opinions of Doctors Giglio and Figueroa; 2) the ALJ mischaracterized the medical record concerning Plaintiff's hospital treatment for stroke-like symptoms; 3) the ALJ failed to evaluate Plaintiff's need to use a cane to ambulate; 4) the ALJ relied on his own lay opinion to interpret raw medical data; and 5) the Appeals Council failed to indicate whether it had considered the additional evidence.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."   The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."   *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

The ALJ's RFC Determination

As already mentioned, Plaintiff contends that the ALJ's RFC determination was erroneous for several reasons, namely, that 1) he improperly "rejected the opinions of Dr. Giglio and Dr. Figueroa for inadequate reasons and without the support of conflicting medical opinion"; 2) he "mischaracterized emergency department records as to Plaintiff's CVA"; 3) he "failed to evaluate Plaintiff's need to use a cane"; and 4) he "relied on his lay interpretation of bare medical findings."

37

## The ALJ Did Not Mischaracterize the Record

The Court begins with Plaintiff's contention that the ALJ "mischaracterized emergency department records as to Plaintiff's CVA."   Insofar as this assertion attempts to imply that Plaintiff actually suffered a CVA (stroke), it is disingenuous and deserving of little discussion since Plaintiff admitted to the ALJ that she did not suffer a stroke.[153]   Plaintiff now attempts to rely on a bare reference in the medical record to her having suffered a CVA.   That, though, appears to have been merely a preliminary diagnosis which was ruled out by testing.[154]  None of Plaintiff's doctors subsequently indicated that she actually suffered a CVA/stroke.   Alternatively, Plaintiff contends that the ALJ "obviously mischaracterized" the medical evidence concerning this same hospitalization, by indicating that Plaintiff was treated and released after less than two hours.   Plaintiff contends, rather, that she was in the hospital for three days, which, she seems to suggest, lends credence to her contention that she was diagnosed with a CVA.   However, to the extent that the ALJ may have erred concerning the amount of time that Plaintiff remained in the hospital for observation and testing, such error is understandable since, as the Court already mentioned, the records from this hospitalization are not entirely clear.   On the other hand, there are admit/discharge dates and times in the records that directly support the ALJ's comment about Plaintiff being released after less than two hours.[155]   Regardless, this alleged time discrepancy

---

[153]  Transcript at 304.   As previously noted, Plaintiff admitted that she did not have a stroke, and suggested instead that her doctors had attributed her symptoms to either to cervical discs or to a prior traumatic brain injury, though there actually is no evidence that her doctors made such a correlation.
[154]  Transcript at 707, 714.
[155]  Transcript at 707, 714.

is irrelevant since as already discussed, Plaintiff admits that she did not suffer a stroke.[156]   Accordingly, Plaintiff's attempt to now use this potential error as some proof that she actually suffered a stroke is unavailing.

The ALJ's Decision to Reject Dr. Giglio's Opinion of Disability
Was Not Erroneous

Plaintiff next contends that "the ALJ's reasons for rejecting Dr. Giglio's treating medical opinion were unsupported and conclusory."   Actually, though, it was Giglio's report that was unsupported and conclusory.   In support of her position, Plaintiff attempts to rely on this statement from Giglio's report: "Pt has severe impairment + function not able +not allowed to work under any circumstances or conditions."   This is not a medical opinion as to Plaintiff's particular physical limitations.   Indeed, Giglio declined to fill out the portion of the form detailing such limitations.   Instead, this sentence is a conclusion as to Plaintiff's ability to work.[157]   However, "[i]t is well settled that a treating physician's opinion that an individual is disabled is not entitled to controlling weight, because the ultimate issue of disability is reserved for the Commissioner." *Fazzio v. Comm'r of Soc. Sec.*, No. 17-CV-977S, 2019 WL 342411, at *6 (W.D.N.Y. Jan. 28, 2019) (citation and internal quotation marks omitted); *see also, Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) ("Dr. Desai's opinion that Taylor was "temporarily totally disabled" is not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner.").   Accordingly, it was not erroneous for the

---

[156]  Transcript at 304.
[157]  *See*, Pl. Memo of Law [#12-1] at p. 15 ("Dr. Giglio made it very clear he believed Plaintiff was disabled and she should [not] be working.").

39

ALJ to state that Giglio's "refusal to evaluate claimant's physical ability to perform any basic work activity weighs against placing any special significance on *his conclusion that claimant is unable to work*."[158]

Plaintiff alternatively contends that it was improper for the ALJ to reject Giglio's opinion of disability as being "inconsistent with the medical evidence,"[159] since "[t]he examinations of record consistently revealed limited range of motion, reduced muscle strength, diminished sensation, difficulty performing heel and toe walking, and abnormal gait." As support for this assertion, Plaintiff cites to three pieces of evidence: Dr. Anand's office note from June 3, 2014; Dr. Jain's office note from October 19, 2015; and Dr. Giglio's office note from November 6, 2014.[160] However, this argument is unavailing, primarily because, as discussed above, the physical examinations of Plaintiff by various doctors were generally unremarkable, contrary to what Plaintiff asserts. Moreover, even the three pieces of evidence that Plaintiff cites for this proposition do not support her position. For example, as already discussed Dr. Anand's examination on June 3, 2014, showed normal findings, including full strength in all extremities, except that Plaintiff's "foot flexion and dorsiflexion on the right side [was] mildly weaker than the left side."[161] Similarly, although Dr. Jain's note from October 19, 2015, indicates that Plaintiff was unable to walk heel to toe, he seems to attribute that to her "poor effort on exam."[162] Finally, Dr. Giglio's office note from November 6, 2014,

[158] Transcript at 25.
[159] See, ALJ's Decision at p. 16, Transcript at 25.
[160] Pl. Memo of Law [#12-1] at p. 15.
[161] Transcript at 572.
[162] Transcript at 577.

showed essentially normal exam results, except that Plaintiff had some muscle pain and "a slightly antalgic gait."[163]   Interestingly, the next time that Giglio examined Plaintiff after that date, on December 2, 2014, he observed that Plaintiff had a normal gait.[164] Consequently, Plaintiff's argument on this point also lacks merit.

<u>The ALJ's Decision to Reject Dr. Figueroa's Consultative</u>
<u>Opinion Was Not Erroneous</u>

Plaintiff next contends that the ALJ's rejection of Dr. Figueroa's consultative opinion was erroneous.[165]   On this point, Plaintiff first contends that it was "grossly inappropriate" for the ALJ to imply that Plaintiff had duped Figueroa by exaggerating her symptoms, since as a medical professional, Figueroa would surely have been able to see through such a ruse.[166]   Once again, however, the Court disagrees.

Preliminarily, it should be remembered that even if the ALJ had accepted Figueroa's opinion, such opinion supports Plaintiff's ability to perform at least sedentary work.   Further, Plaintiff makes no effort to rebut the ALJ's factual observation that Figueroa's findings were clearly inconsistent with the findings by other doctors.   In any event, the Court notes that the ALJ's finding on that point is clearly supported by substantial evidence.

Plaintiff nevertheless contends that the ALJ improperly substituted his own medical judgment in place of Figueroa's medical judgment.   Admittedly, an ALJ "is not

---

[163] Transcript at 594-595.
[164] Transcript at 591.
[165] Figueroa's findings would support Plaintiff's ability to perform sedentary work.
[166] *See*, Pl. Memo of Law [#12-1] at p. 16 ("It is highly concerning the ALJ, a person with no medical expertise, concluded her was so much more medically knowledgeable than Dr. Figueroa that he was able to identify Plaintiff's malingering but Dr. Figueroa was not.").

permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). However, that is not what happened here. Such a violation might have occurred if the ALJ had interpreted Figueroa's findings to reach different conclusions than Figueroa reached. However, the Court does not believe that principle applies where the ALJ merely points out that the way the claimant *presented herself* to the evaluating doctor was entirely different than how she presented herself to her other doctors. Indeed, the ALJ never implied that Figueroa's opinion was somehow wrong or unreasonable *based on what she observed during the consultative examination*; in fact, the ALJ acknowledged that "Dr. Figueroa's clinical observations support her findings."[167] Rather, the ALJ pointed out that what Figueroa reported observing was very different from what Plaintiff's other doctors had reported observing, with the implication being of course that that either Plaintiff's symptoms drastically worsened just prior to the consultative exam by Figueroa, or Plaintiff dramatically exaggerated her symptoms during the consultative examination. The ALJ considered the former possibility, but ruled it out, based on a lack of medical evidence to explain such a rapid deterioration.[168] In particular, the ALJ noted the lack of a medical explanation for the stroke-like symptoms that Plaintiff claimed to have experienced in January 2016. The ALJ further noted that during the hearing, which was after Plaintiff claimed to have experienced

---

[167] Transcript at 26.
[168] Transcript at 27 ("While one possible explanation for this could be that claimant's condition significantly deteriorated after she went to the hospital for exhibiting stroke-like symptoms in January 2016, there are no medical records indicating claimant actually had a stroke.").

stroke-like symptoms and shortly before Figueroa's examination, Plaintiff "gave no indication that she had lost nearly all use of the left side of her body."[169]   In sum, the ALJ properly explained how he weighed Figueroa's opinion, based upon all the evidence in the record.   Therefore, the Court concludes that Plaintiff's contention that the ALJ improperly substituted his own medical judgment for Figueroa's medical judgment is without merit.

> The ALJ Did Not Err In Making An RFC Finding That Was
> Not Directly Supported By A Medical Opinion

Plaintiff further maintains that since the ALJ "rejected" the opinions of Doctors Giglio and Figueroa, he must have improperly relied on his own lay interpretation of bare medical findings in making his RFC determination.   The gist of Plaintiff's argument is that an ALJ can never properly reach an RFC determination that is not supported by a specific medical opinion, since such a determination would involve the ALJ rendering his own medical opinion.   Insofar as Plaintiff is alleging the existence of a *per se* rule in this regard requiring remand, the Court disagrees, since the Second Circuit has rejected this same argument. *See, Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) ("The medical record in this case is quite extensive. Indeed, although it does not contain formal opinions on Tankisi's RFC from her treating physicians, it does include an assessment of Tankisi's limitations from a treating physician, Dr. Gerwig. Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, *we hold*

---

[169]  Transcript at 27.

*that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity.*") (emphasis added); *see also*, *Monroe v. Commissioner of Social Security*, 16-1042-cv, 676 Fed.Appx. 5, 8-9 (2d Cir. Jan. 18, 2017) ("[Claimant] specifically contends that, because the ALJ rejected Dr. Wolkoff's opinion, there was no competent medical opinion that supported the ALJ's RFC determination. Where, however, the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity, a medical source statement or formal medical opinion is not necessarily required.") (citing *Tankisi*).

The holdings of *Tankisi* and *Monroe* apply here, since, as already discussed at great length, the instant case involves an extensive record spanning several years, that is "adequate to permit an informed finding by the ALJ" as to Plaintiff's functional limitations.   Specifically, the medical findings by Plaintiff's doctors consistently report unremarkable findings, or, put differently, they consistently show the lack of any significant positive findings to support Plaintiff's claim of disability.   The ALJ relied upon those "clinical findings," as well as "diagnostic tests, and the treatment that [Plaintiff] received," in reaching his RFC determination,[170] and his determination is supported by substantial evidence.[171]   Accordingly, remand is not required simply because there is no opinion evidence that corresponds to the physical aspects of the RFC.[172]

---

[170] ALJ's decision at p. 10, Transcript at 19 ("The medical evidence concerning claimant's physical impairments is not consistent with the severity of symptoms and the degree of limitations that would preclude claimant from   performing work.   Clinical findings, diagnostic tests, and the treatment that claimant has received provide a reasonable basis to conclude that claimant is capable of performing a range of light work.").

[171] The ALJ also relied on non-medical evidence, such as Plaintiff's statement that she had to run after her toddler when he kept escaping from his stroller, despite her claim of being unable to walk.

[172] There is opinion evidence from Dr. Santarpia supporting the non-exertional aspects of the RFC

<u>The ALJ Did Not Err By Failing To Evaluate Plaintiff's</u>
<u>Need to Use a Cane</u>

Plaintiff next contends that the ALJ failed to evaluate her need to use a cane to ambulate.   In particular, Plaintiff asserts that "the ALJ was required to consider [the impact of Dr. Figueroa's finding that Plaintiff's cane was medically necessary] or at least explain how he determined [that the cane] was not truly medically necessary.   As he failed to do so, remand is further warranted."[173]   However, the Court again disagrees.

Plaintiff's reference to Dr. Figueroa's report tacitly emphasizes the significant point that Figueroa is the only doctor of record to indicate that Plaintiff needed a cane. As already explained, Dr. Figueroa's opinion in that regard may well have been justified, based on what she observed during the consultative exam.   However, the Court has already explained that the ALJ was justified in rejecting Figueroa's opinion, since Plaintiff's presentation during the consultative exam was "vastly divergent" from her presentations to her other doctors, both before and after the consultative exam.   In addition to explaining why Figueroa's report was not entitled to weight, the ALJ referred several times to other evidence supporting Plaintiff's ability to walk without a cane, as well as to the lack of evidence suggesting otherwise.   For example, the ALJ stated that "there is insufficient evidence to establish that claimant's impairments render her unable to ambulate effectively."[174]   Additionally, the ALJ referred to multiple findings by various doctors that Plaintiff had a normal gait, as well as to evidence that Plaintiff was able to

---

finding.
[173]  Pl. Memo of Law [#12-1] at p. 19.
[174]  Transcript at 14.

"run after her son" when he climbed out of his stroller.[175]   Accordingly, Plaintiff's

argument, that remand is required because the ALJ failed to evaluate Plaintiff's need to

use a cane, lacks merit.

> The Additional Evidence Submitted To The Appeals Council
> Does Not Cast Doubt On The ALJ's Determination

Lastly, Plaintiff contends that remand is required for consideration of the

additional evidence submitted to the Appeals Council.   In this regard, Plaintiff contends

that the Appeals Council erred by failing to discuss or even acknowledge the additional

evidence.   The Court agrees that the Appeals Council did not discuss the additional

evidence, but does not agree that remand is required.

The Second Circuit has explained that "[e]ven if the Appeals Council err[s] by

rejecting additional evidence, remand is only appropriate where there is a reasonable

possibility that this evidence would have influenced the ALJ to decide the disability

determination differently." *Tricarico v. Colvin*, No. 15-3786, 681 Fed.Appx. 98, 102 (2d

Cir. Mar. 3, 2017) (citation and internal quotation marks omitted).

Based on the Court's review above of the additional evidence that was submitted

to the Appeals Council, there is no reasonable possibility in this action that such

evidence would have caused the ALJ to decide Plaintiff's claim differently.   To the

contrary, the Court believes that the additional evidence adds support for the ALJ's

decision to deny Plaintiff's claim.   Most notably, as already discussed, Ostrom's office

note from March 15, 2016 raises further doubts about the legitimacy of Plaintiff's

---

[175]  Transcript at 21.

presentation at the consultative examination with Figueroa two weeks later, since in that office note, Plaintiff reportedly states both that she is considering starting an exercise routine, and that she spends hours performing household chores when she is unable to sleep.   Even ignoring the implications of that office note, the additional evidence simply does not provide any compelling new evidence of disability that would have been likely to change the ALJ's mind.   Accordingly, Plaintiff's contention that remand is required for consideration of this additional evidence lacks merit.

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings [#12] is denied, Defendant's motion [#17] is granted, and this matter is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        September 30, 2019

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge